1 Patrice L. Bishop (182256)
pbishop@ssbla.com
2 **STULL, STULL & BRODY**
9430 W. Olympic Blvd., Suite 400
3 Beverly Hills, CA  90212
Tel:     310-209-2468
4 Fax:    310-209-2087

5 *Counsel for Plaintiff*

6 (Additional Counsel on Signature Page)

7

8                    **UNITED STATES DISTRICT COURT**

9          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

11

12 VICTOR VELOSO, Derivatively on Behalf     ) Case No. 4:15-cv-4625
13 of ROCKET FUEL INC.,                      )
                                            )
14                        Plaintiff,         )
                                            )
15            v.                             ) **VERIFIED SHAREHOLDER**
                                            ) **DERIVATIVE COMPLAINT**
16 GEORGE H. JOHN, RICHARD FRANKEL,          )
   ABHINAV GUPTA, J. PETER                   )
17 BARDWICK, SUSAN L. BOSTROM,               )
   RONALD E. F. CODD, WILLIAM               ) **DEMAND FOR JURY TRIAL**
18 ERICSON, JOHN GARDNER, CLARK              )
   KOKICH, and MONTE ZWEBEN,                 )
19                                           )
20                        Defendants,        )
                                            )
21 and-                                      )
                                            )
22 ROCKET FUEL INC., a Delaware              )
23 Corporation,                              )
                                            )
24                    Nominal Defendant.     )
                                            )
25 _____ )

26

27

28

Plaintiff Victor Veloso ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Rocket Fuel Inc. ("Rocket Fuel" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Rocket Fuel with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of Rocket Fuel against certain of its officers and directors seeking to remedy Defendants' (as defined below) breach of fiduciary duties, gross mismanagement, and unjust enrichment that occurred from September 20, 2013 through the present (the "Relevant Period") and have caused substantial harm to Rocket Fuel.

2.     Rocket Fuel provides advertising solutions that transform digital media buys into self-optimizing engines to exceed advertising goals from awareness to sales.  The Company's artificial intelligence ("AI") system autonomously buys ad spots, or impressions, one at a time, on advertising exchanges to create portfolios of impressions designed to optimize the goals of its advertisers, such as increased sales, heightened brand awareness and decreased cost per customer acquisition.

3.     Advertisers want online content seen by people who want to buy a product or service.  The internet advertising industry is riddled with robotic traffic ("bot traffic" or "fraudulent traffic") which certain people use to profit from fake, nonhuman traffic.  Bot traffic is produced by code, not people, so it has less of an ability to generate real purchases.  In fact, bots can copy the behavior of online consumers, clicking from one site to the next, pausing at ads, and watching videos.  This bot activity dilutes the value and quality of real publisher ad inventory, otherwise known as inventory quality.

4. Medialink (an Advertising consultancy firm) believes that 25% of online ad revenue is wasted on fraud, and comScore (a piracy audience-research firm) estimates that 36% of online ad impressions are generated by code. In an article published on <u>The Wall Street Journal</u> in March 2014 entitled *A 'Crisis' in Online Ads: One-Third of Traffic Is Bogus* reported that "[b]illions of dollars are flowing into online advertising . . . marketers also are confronting an uncomfortable reality: rampant fraud. . . . Vivek Shah, the chairman of the Interactive Advertising Bureau, said at the group's annual conference last month [February 2014] that Internet advertising was facing a 'crisis.'"

5. Defendants named herein were reckless in not knowing or turned a blind eye to the fact that the Company was unable to adequately identify and eliminate ad fraud and bot traffic in Rocket Fuel's advertising campaigns. To successfully consummate two public offerings, Defendants assured the public that the Company's proprietary technology could "identify and eliminate all" such threats. During the Relevant Period, Defendants represented that the Company's proprietary artificial intelligence ("AI") and technology gave it an advantage that delivered "compelling results" for its customers, including the ability to "block bad sites and pages before we ever serve a single ad on them." This was far from the truth.

6. Also, during the Relevant Period, the Company represented that it had the ability to:

> Undermine fraudulent practices and make sure con artists always leave empty handed. Using the same powerful technology that optimizes our clients' campaigns, Rocket Fuel is able to identify and eliminate all threats before serving a single ad.

Indeed, Defendants represented that internal studies conducted by Rocket Fuel regularly discard "over 40 percent of the opportunities we have to bid on ad space . . . because they don't pass our quality filters. . . ." As more fully described below, these representations were materially false and misleading at the time of publication. In fact, Defendants were at least reckless in not knowing that their ability to combat and eliminate ad fraud was inadequate and was jeopardizing the Company's financial performance, causing the Company's customers to leave. Defendants also turned a blind eye to the number of advertising clients seeking to go "in-house" prior to the Initial

COMPLAINT
CASE NO. 4:15-cv-4625

Public Offering ("IPO") in order to broker their own advertising campaigns or to build platforms similar to the Company's platform.

7.     During the Relevant Period, Defendants overstated their ability to combat ad fraud but also understated the extent of the problem.  Defendants described a <u>Financial Times</u> article (published in May 2014) concerning the Company's fraud traffic exposure as "sensational headlines on top of non-news."   Quickly thereafter, the Company abandoned its prior representation that: (i) its "powerful technology . . . is able to identify and eliminate all threat before serving a single ad;" and (ii) that its "three layers of defense that block bad sites and pages before a single ad is ever served on them."  Instead, the Company stated that "Rocket Fuel is able to identify and eliminate threats before serving a single ad" and that the Company's "three layers of defense proactively block[] bad sites and pages. . . ."

8.     As a result of these misrepresentations, the price of the Company's common stock opened for trading on September 20, 2013, at close to $60 per share – double the Company's IPO price of $29.00 per share – and reached a trading high of $71.89.

9.     The boost in share price was short-lived.  On August 5, 2014, the Company lowered its full-year 2014 revenue guidance due to customer concern about inventory quality resulting from the Company's inability to identify and eliminate fraudulent ad traffic.  That same day, on a conference call, Defendant George John (CEO of the Company) stated that "[a]cross all channels, we've seen increased advertiser and agency interest in the quality of ad space and audiences they buy with increased concerns around bot traffic and viewability."   In truth, on August 12, 2014, <u>The Wall Street Journal </u>reported that the "online ad industry has been well aware of its fraud problem for years. . . ."

10.     Following the August 5, 2014 announcement, the Company's share price fell approximately 30% from $24.75 to $17.05 on August 6, 2014, in a single day on high trading volume.

11.     Before the August 5, 2014 disclosures, the Company's insiders cashed out in the February 2014 Secondary Offering for $175 million, at prices as high as $61 per share.  The timing was no coincident as Defendants were reckless or turned a blind eye to the fact that it

COMPLAINT
CASE NO. 4:15-cv-4625

1  would not be able to meet financial expectations.  Moreover, the Company's insiders obtained an

2  early release from the IPO lock-up of their shares.  Rather than wait 180 days per the lock-up

3  agreement -- which would have ended on March 18, 2014 -- certain Defendants sold shares in

4  early February 2014 for approximately $35 million more than they would have been able to but

5  for the early release from the lock-up.  The Company's insiders therefore timed the Secondary

6  Offering to enable themselves to cash out prior to announcing the Company's poor Q1 2014

7  financial results.

8  **JURISDICTION**

9  12.  This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332

10  because there is complete diversity among the parties and the amount in controversy exceeds the

11  sum of $75,000, exclusive of interest and costs.

12  13.  Venue is proper in this Court because the Company maintains its executive office

13  at 1900 Seaport Boulevard, Pacific Shores Center, Redwood City, CA 94063, a substantial portion

14  of the transactions and wrongs complained of herein occurred in the County of San Mateo, and

15  Defendants have received substantial compensation within the Northern District of California by

16  doing business here and engaging in numerous activities that had an effect in this jurisdiction.

17  **THE PARTIES**

18  **Plaintiff**

19  14.  Plaintiff Victor Veloso is, and was at relevant times, a shareholder of Rocket Fuel.

20  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the

21  rights of the corporation.  Plaintiff is a resident of the State of New Hampshire.

22  **Nominal Defendant**

23  15.  Nominal Defendant Rocket Fuel describes itself as a leading provider of AI

24  advertising solutions that transform digital media buys into self-optimizing engines that learn and

25  adapt in real time to exceed advertising goals from awareness to sales.  Rocket Fuel is a Delaware

26  corporation with principal executive offices located at 1900 Seaport Boulevard, Pacific Shores

27  Center, Redwood City, California.

28

COMPLAINT
CASE NO. 4:15-cv-4625

1

2    **Director Defendants**

3         16.    ***Defendant George H. John*** ("John") is the Company's Chief Executive Officer

4    ("CEO") and Chairman of the Board of Directors ("Board").   While in possession of material

5    (non-public) information concerning the Company's true business health, John sold 307,877

6    shares of his stock for $17,935,374 in proceeds.

7         17.    ***Defendant Richard Frankel*** ("Frankel") is the Company's President, a director,

8    and was the Company's Chief Financial Officer ("CFO") from March 2008 to February 2009.

9    While in possession of material (non-public) information concerning the Company's true business

10   health, Frankel sold 254,323 shares of his stock for $14,815,586 in proceeds.

11        18.    ***Defendant Susan L. Bostrom*** ("Bostrom") is a director of the Company.  Bostrom

12   is a member of the Compensation Committee.

13        19.    ***Defendant Ronald E. F. Codd*** ("Codd") is a director of the Company.  Codd is a

14   member of the Audit Committee and the Nominating and Governance Committee.

15        20.    ***Defendant William Ericson*** ("Ericson") is a director of the Company.  While in

16   possession of material (non-public) information concerning the Company's true business health,

17   Ericson sold 1,656,776 shares of his stock for $101,063,336 in proceeds.  Ericson is a member of

18   the Compensation Committee and Nominating and Governance Committee.

19        21.    ***Defendant John Gardner*** ("Gardner") is a director of the Company.  While in

20   possession of material (non-public) information concerning the Company's true business health,

21   Gardner sold 407,693 shares of his stock for $23,750,155 in proceeds.  Gardner is a member of the

22   Audit Committee.

23        22.    ***Defendant Clark Kokich*** ("Kokich") is a director of the Company.  Kokich is a

24   member of the Audit Committee and the Nominating and Governance Committee.

25        23.    ***Defendant Monte Zweben*** ("Zweben") is a director of the Company.  While in

26   possession of material (non-public information) concerning the Company's true business health,

27   Zweben sold 12,996 shares of his stock for $757,081 in proceeds.

28

COMPLAINT
CASE NO. 4:15-cv-4625

**Officer Defendants**

24.    ***Defendant Abhinav Gupta*** ("Gupta") is Vice President of Engineering.  Gupta is also the Company's co-founder.   While in possession of material (non-public) information concerning the Company's true business health, Gupta sold 186,855 shares of his stock for $10,885,238 in proceeds.

25.    ***Defendant J. Peter Bardwick*** ("Bardwick") was the Company's CFO from September 2011 to September 2014.  While in possession of material (non-public) information concerning the Company's true business health, Bardwick sold 17,500 shares of his stock for $1,019,462.50 in proceeds.

26.    Defendants John, Frankel, Bostrom, Codd, Ericson, Gardner, Kokich, and Zweben are herein referred to as the "Demand Defendants."

27.    Defendants Gupta and Bardwick are herein referred to as the "Officer Defendants."

28.    Defendants John, Frankel, Bostrom, Codd, Ericson, Gardner, Kokich, Zweben, Gupta and Bardwick are herein referred to as "Defendants."

29.    Defendants John, Frankel, Ericson, Gardner, Zweben, Gupta and Bardwick are herein referred to as the "Insider Selling Defendants."

## CODE OF BUSINESS CONDUCT AND ETHICS

30.    As members of the Company's Board, the Demand Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

31.    The conduct of all Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Rocket Fuel, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE DEFENDANTS

32.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Rocket Fuel, Defendants owed Rocket Fuel and its investors the fiduciary obligations of trust, loyalty, and good faith.  The

COMPLAINT
CASE NO. 4:15-cv-4625

obligations required Defendants to use their utmost abilities to control and manage Rocket Fuel in an honest and lawful manner.  Defendants were and are required to act in furtherance of the best interests of Rocket Fuel and its investors.

33.     Each director of the Company owes to Rocket Fuel and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

34.     To discharge their duties, the officers and directors of Rocket Fuel were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Rocket Fuel were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Rocket Fuel conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable

COMPLAINT
CASE NO. 4:15-cv-4625

inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

35. Each Defendant, by virtue of his/her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Rocket Fuel, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

36. Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, Rocket Fuel has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

**BACKGROUND**

**Ad Buying Platform**

37. Most companies do not purchase online advertising directly. Instead, companies use digital buying groups to negotiate pricing for advertisement space and to develop platforms for buying and distributing digital media to consumers.

38. Advertisement space is (on the whole) sold through an "advertising exchange."

39. Digital buying groups engage in "programmatic" ad buying, using software to purchase digital advertising, as opposed to the traditional process that involves Request for Proposals, human negotiations and manual insertion orders. This bidding is a type of programmatic ad buying which refers to the purchase of ads through real-time auctions.

COMPLAINT
CASE NO. 4:15-cv-4625

Programmatic software also allows advertisers to buy guaranteed ad impressions from specific publisher sites.  Buyers can pick which impressions they wish to purchase.  Programmatic buying makes the ad buying system more efficient, and therefore cheaper, by removing humans from the process wherever possible.

40.    Defendant John stated the process described above is "similar to programmatic stock trading insofar as buying happens as the result of a computational proxy bidding on behalf of human masters."[1]  Defendant John's depicted "programmatic buying" as follows:

> [T]he application of artificial intelligence and big data to:
>
> - Bid on an advertising inventory source (*e.g.*, a 300x250 IAB standard ad offered by Yahoo!, a 30 second pre-roll video on YouTube.com, a Facebook ad)
> - Through an advertising exchange
> - In real time
> - For the opportunity to:
>   o  show one specific ad
>   o  to one anonymous consumer
>   o  in one context
>   o  on one device[2]
>   o

41.    In 2014, $9.3 billion was spent in programmatic ad buying.[3]  Programmatic ad buying is however subject to increased risk, depending on the ad exchange and marketplace in which a digital buying group purchases digital ads.  In fact, less expensive marketplaces do not:

> [O]ffer guarantees against non-viewable, mislabeled, non-brand-safe, fraudulent or otherwise low-quality impressions.  Low-quality ads can be a significant risk on exchanges that sell large volumes of low-priced inventory.  So the buyer has the power to cho[o]se exactly what they buy, and they can [get] great deals on valuable impressions; but it's also up to them to beware of bad sellers. (Just like shopping on Craigslist.)[4]

42.    There is however an incentive (from companies such as Rocket Fuel) to buy from less expensive marketplaces.  For example, as Thomas Servatius of IPONWEB states that "when an advertiser buys traffic on a fraud site, it usually comes very cheap – much cheaper than human

---

[1]      http://adexchanger.com/online-advertising/define-programmatic-buying/#rocketfuel.

[2]      *Id.*

[3]      http://blogs.wsj.com/cmo/2014/09/29/programmatic-ad-buying-to-reach-21-billion/.

[4]      http://www.marketingmag.ca/advantage/ad-vantage-glossary-defining-rtb-111231.

COMPLAINT
CASE NO. 4:15-cv-4625

- 9 -

built sites – and it has good click through rates.  So if you have fraud in your advertising mix, what you see as an advertiser is that for a small amount of money, you get a good number of clicks."[5]  Further, according to Marco Bertozzi of AOD, "[e]ducating marketers on the importance of paying more for quality inventory will need to happen because the buy and the sell side are chasing K[ey] P[erformance] I[ndicator]s determined by said client who may be calling for lower CPMs versus quality interactions."[6]

**Advertising Fraud**

43.     Digital advertising fraud is a widespread problem.  In March 2012, it was reported that 51% of online traffic was non-human bot traffic.  In February 2013, in an article by <u>AdWeek</u> entitled T*he Bots Are Taking Over*, bot traffic cost marketers between $1 billion and $2 billion in display advertising in the fourth quarter of 2012 alone.  In an October 2013 report in the same publication, it was reported that "the online ad industry is facing a swelling crisis, one defined by fake traffic, bogus publishers and invisible Web visitors. . . ."  Pursuant to the IAB, about 36% of all web traffic is considered fake, the product of computers hijacked by viruses and programmed to visit sites.

44.     In order to achieve its revenue and growth guidance, Rocket Fuel must screen approximately 500 billion ad impressions each month.  Rocket Fuel cannot achieve effective filtering rates at that volume, but remains dependent on such volume to generate the type of revenue growth it has promised.

45.     On September 30, 2013, <u>The Wall Street Journal</u> reported that "fraudsters [] erect sites with phony traffic, collecting payments—often through middlemen and sometimes directly from advertisers. . . ."  Ultimately, if fraudulent traffic goes undetected, advertisers end up paying a material portion of their campaign dollars to fraudsters who deliver specious ad impressions that are not viewed by humans.

---

[5]      https://www.exchangewire.com/blog/2014/08/11/ats-london-panel-preview-click-frauddetection-and-prevention/.

[6]      *Id.*

COMPLAINT
CASE NO. 4:15-cv-4625

46.     In April 2014, the problem was described as follows: "[i]f we are paying any [cost-per-thousand rate] for an impression, it should be an impression.  Imagine you buy a dozen donuts, and you open the box and there's one donut.  I want to understand what I am getting for the money."[7]  Specific examples of monetizing fraud include: (i) false impressions – programs imitate legitimate users by repeatedly loading a page or ad for the purpose of generating higher fees in CPM[8] advertising.  Advertisers paying for media on a CPM basis are paying for this fraudulent inventory; (ii) false clicks – programmatic clicking and unusual click activity, which is both deceptive and detrimental to the bottom line in ads purchased on a CPC basis;[9] and (iii) false attribution – stealing credit for sales within a CPA or CPV campaign,[10] despite the fact that the ad impressions were not real and/or not in view. The theft causes dollars to be funneled away from legitimate channels towards fraudulent ones that have placed the most/latest cookies before a consumer purchase or conversion.

47.     On July 23, 2014, Digiday issued an article entitled *Ad Fraud has a Chicken Little Problem* that featured and revealed the Company's struggles with ad fraud:

> In May [2014], online security company Telemetry examined a sample of 365,000 impressions of a Mercedes Benz campaign sold by Rocket Fuel and found that 57 percent of them were from bots. While Telemetry didn't argue that Rocket Fuel intentionally sold fraudulent impressions, it still reflected poorly on Rocket Fuel, which is a public company that has worked with clients like Toshiba and Buick.

48.     The study by ad fraud detection company Telemetry was covered by the Financial Times in a May 26, 2014 report that first disclosed how Rocket Fuel's Mercedes-Benz ad campaign had "raise[d] questions about Rocket Fuel's assertions on its website that it 'makes sure the ''bad actors'' always leave empty-handed.'"

---

[7]     http://www.adweek.com/news/technology/kellogg-data-exec-says-digital-ad-fraudunacceptable-156704.

[8]     "CPM" means "cost per mille" or "cost per impression".

[9]     "CPC" means "cost per click".

[10]    "CPA" means "cost per action" and "CPV" means "cost per view".

COMPLAINT
CASE NO. 4:15-cv-4625

49.     On August 5, 2014, Rocket Fuel's shares plunged after the Company issued guidance that was far below analysts' and the Company's own estimates for third quarter and full year of 2014 due to customer concerns about poor inventory quality due to ad fraud.   These concerns were not new within the Company and had been negatively impacting the Company's revenue growth and operations throughout the Relevant Period.

**Rocket Fuel Misrepresents Its Ability**

**To Detect And Eliminate Ad Fraud**

50.     Throughout the Relevant Period, Defendants caused the Company to represent that its proprietary technology differentiated it from other ad tech companies that were less likely to identify and eliminate bot traffic.   Continuing throughout the Relevant Period, Defendants caused the Company to represent that:

> [W]e're proud to announce the details on how our Real-Time Brand Safety Shield provides *the highest levels of brand assurance* to our clients.
>
> At Rocket Fuel we take a proactive approach, with three layers of defense that block bad sites and pages *before we ever serve a single ad on them*.   By building additional levels of safety and security right into our platform and processes, we ensure our technology delivers both ROI [return on investment] and *peace of mind for brands*.   [Emphasis added].

51.     The Company understood the importance of fraud detection.   In its IPO materials, the Company's "risk disclosures" represented that "[i]f we fail to detect fraud or serve our advertisers' advertisements on undesirable websites, our reputation will suffer, which would harm our brand and reputation and negatively impact our business, financial condition and results of operations." However, there was no indication in the IPO materials that the Company had any concern with advertising fraud, instead indicating that the Company used "proprietary technology to detect click fraud and block inventory."

52.     On September 20, 2013, the Company's share price rose 93% from $29.00 to close at $56.10 as a result of the IPO roadshow indicating the Company's technology would "block bad sites and pages *before we ever serve a single ad on them*."

53.     In November 2013, and throughout the Relevant Period, the Company also represented that its "powerful Advertising That Learns® technology uses real-time data points to recognize these bad actors and block them at the source"[11] and that the Company "is able to identify and eliminate all threats before serving a single ad."[12]

54.     On November 13, 2013, Defendants caused the Company to file its quarterly report for the quarter ending September 30, 2013, in which the Company reiterated its "record revenue" and "strong growth."   In response, the Company's stock price increased from $51.01 on November 13, 2013, to close at $54.89 the following day.

55.     Based on these numbers and the Company's representations, analysts firm Piper Jaffray "believe[d] that FUEL remains the best play on the accelerating shift of traditional online display advertising dollars to algorithmically purchased advertising."   Further, Evercore Group L.L.C. ("Evercore") saw "customers growing from 840 this year to nearly 5,000 by 2018."

56.     Defendants continued to cause the Company to represent that its technology differentiated it from other ad tech companies that were less likely to identify and eliminate bot traffic.   For example, on December 4, 2013, at the NASDAQ OMX Investor Program, Bardwick represented:

> We are looking today at 38 billion impressions a day, opportunities to buy impressions.   Typically, the first step is we filter those. ***We're very good about -- we have proprietary technology about filtering for bots.  We also filter for quality***.   Obviously, we work with big-name advertisers who are very concerned about the quality of where their advertising goes.  [Emphasis added].

57.     During the same event, in response to the question: "How big a problem are bots in your industry?  Are you able to quantify that?  I mean, how do you convince your advertisers that your product solution," Bardwick responded that "[i]t's a problem," but that the Company had "proprietary technology" that "filter[ed] out bots."  Bardwick further stated that, though it is a "bit of a cat-and-mouse game," he believed "the advertisers and then certain players ***like us will continue to stay ahead*** of the people who are trying to make a quick buck."

---

[11]     http://rocketfuel.com/blog/rocket-fuel-brand-safety-series-incentivized-traffic.

[12]     http://rocketfuel.com/blog/rocket-fuel-brand-safety-series-suspicious-activity.

COMPLAINT
CASE NO. 4:15-cv-4625

58.     Defendants were reckless in not knowing or were turning a blind eye to the fact that the Company was facing problems with inventory quality, its ability to combat ad fraud, and the adverse impact on its sales.  Such problems caused advertisement companies and clients to opt out of Rocket Fuel's services and create similar services in-house.  In turn, these defections were negatively impacting the Company's financial performance.  However, this was only partially revealed in May 2014 with the First Quarter 2014 financial results.

59.     On January 22, 2014, Defendants caused the Company to release a press release announcing its "Preliminary Fourth Quarter 2013 Financial Results and Initial 2014 Guidance." The Company provided initial guidance for the first quarter in the range of $73 million to $76 million and revenue in the range of $420 million to $435 million for FY 2014.

60.     The Company's common stock continued to trade at levels artificially inflated by Defendants' guidance and, but for that guidance, the Company's share price would have decreased further than it did on January 23, 2014.  Unbeknownst to the public, Defendants' aggressive fiscal 2014 revenue guidance was designed to inflate and maintain the Company's high stock price so insiders could sell close to $175 million worth of privately held shares in the Secondary Offering.

61.     On January 27, 2014, Defendants caused the Company to file a Registration Statement on Form S-1/A with the SEC relating to its proposed Secondary Offering.  The aggregate net proceeds received by the Company from the Secondary Offering totaled approximately $115.4 million, after deducting underwriters' discounts and commissions and offering expenses. The Secondary Offering materials failed to disclose the challenges the Company faced or the true risks posed by the impact of digital ad fraud and bot traffic on the Company's operations and financial performance, including the loss of its customers, and instead presented similar representations as in the IPO materials.

62.     The public was unaware that the Company was encountering issues with inventory quality and that the Company insiders were cashing out due to the negative impact caused by the inventory quality.  As Stephen Ju of Credit Suisse stated in a February 6, 2014 analyst report: "FUEL shares have pulled back ~20% since pricing its secondary on 30 January.  Rocket Fuel is still the same company as it was last week. . . . Our long-term thesis remains unchanged – FUEL is

1   positioned to continue to gain share in a secular growth segment (RTB) within online marketing. .

2   . .”

3   63.   Further, Piper Jaffray stated in a February 6, 2014 analyst report that the only risks

4   seen for Rocket Fuel's price target included "competition, stalled shift to RTB platforms for

5   display, and inability of Rocket Fuel to successfully purchase media on open markets." And while

6   it had concerns that "the company's industry-high take-rate will begin to be questioned by

7   advertisers," Evercore nonetheless noted that it "may be underestimating their value proposition to

8   agencies and advertisers."  Nothing indicated that Rocket Fuel was having issues with ad fraud or

9   that companies were opting to move in-house.

10   **The Secondary Offering**

11   64.   The IPO materials stated that directors, executive officers, and other insiders agreed

12   not to offer or sell their common stock "without the permission of the representatives of the

13   underwriters for 180 days from the date of the initial public offering."  The lock-up agreement was

14   supposed to end on March 18, 2014.  The Registration Statement stated that, "[i]n connection with

15   our initial public offering, we, all of our directors and executive officers and substantially all of

16   our stockholders agreed, subject to certain customary exceptions, not to offer, sell or agree to sell,

17   directly or indirectly, any shares of common stock without the permission of the representatives of

18   the underwriters for a period of 180 days from the date of our initial public offering."

19   65.   By January 27, 2014, the Company's insiders however obtained an early release

20   from the lock-up.  The Company was therefore able to announce the Secondary Offering on

21   January 27, 2014 – weeks before the agreed to lock up expiration of March 18, 2014.  During that

22   period, the Company's share price fell nearly 20% generating a $35 million profit for the

23   Company's insiders.

24   66.   Other insiders, including the Demand Defendants and other Company executives,

25   sold shares in the Secondary Offering also based upon the early release granted by the

26   representatives of the underwriters. For example, Gupta sold 186,855 shares in the Secondary

27   Offering for proceeds of approximately $11 million.  Trigg sold 9,115 shares in the Secondary

28

COMPLAINT
CASE NO. 4:15-cv-4625

1   Offering for proceeds of $531,039.90.  Rochnik sold 10,300 shares in the Secondary Offering for

2   proceeds of $600,026.50.

3       67.     At the time of these stock sales, the Insider Selling Defendants were aware or

4   deliberately reckless in not knowing that the Company's issues with customer sales and inventory

5   quality was negatively impacting the Company's financial performance.

6       68.     Nonetheless, on February 20, 2014, in addition to announcing its Fourth Quarter

7   2013 results, the Company reiterated the same first quarter and full year of 2014 outlook that it

8   announced on January 22, 2014.  In the same press release, Bardwick represented that Rocket

9   Fuel's "robust revenue growth and continued focus on operational efficiency puts us on a strong

10  trajectory for 2014."

11      69.     The Company hosted a conference call on February 20, 2014, with analysts

12  following its earnings announcement for its Fourth Quarter 2013.  John continued to represent that

13  the Company's "AI and big data platform is a competitive advantage enabling us to transform

14  advertising and gain market share." Further, Bardwick further reiterated the Company's 2014

15  financial guidance.

16      70.     On March 3, 2014, analyst Daniel Salmon of BMO Capital Markets reported:

> Rocket Fuel will keep investing its high take-rate into technology
> R&D in order to maintain superior ROI performance and revenue
> growth.  *Management has one of the highest degrees of confidence
> in its technology advantage that we've encountered in the ad tech
> space, and Rocket Fuel's track record backs this up*. The continued
> focus on artificial intelligence remains unique among all vendors
> we've encountered and management believes this removes more
> human decision making versus other demand-side platforms.  The
> company then reinvests this superior performance in both R&D and
> sales/support services for its clients.  [Emphasis added].

23      71.     On March 11, 2014, Bardwick responded to questions concerning bots at Piper

24  Jaffray Technology, Media and Telecommunications Conference.  Bardwick stated that the

25  Company was "very proud of the fact that we invest significantly in bot-filtering technology."

26  Bardwick further stated that the Company has "*a lot of proprietary technology that we have*

27  *implemented.  We actually filter initially about a third of the 40 billion impressions a day that*

28

COMPLAINT
CASE NO. 4:15-cv-4625

*we see*.  Some of it is bot; some of it is brand-related.  But over time, I think that that kind of traffic will become a lesser issue because advertisers are getting smarter."  (Emphasis added).

72.     In responding to a question about why companies switch to Rocket Fuel, Bardwick stated that "[i]t's because they put $1 million into the Rocket Fuel box, and they sell more goods and services for that $1 million. . . . *We have 40 billion opportunities to buy ad impressions a day.  We actually value each one of those and determine what we want -- if we want to bid on* -- The machines determine . . . what we want to bid on them, and then the machines learn. . . ." (Emphasis added).

73.     Bardwick also reaffirmed the Company's First Quarter 2014 guidance and Full Year 2014 guidance.  Moreover, the Company continued to state that its technology would "block bad sites and pages before we ever serve a single ad on them".

74.     An April 25, 2014 article entitled *Rocket Fuel Stock Hits All-Time Low in Wake of Insider Trades*, published online at <u>AdExchanger</u>, stated in relevant part:

> Rocket Fuel's stock closed at $31.04 Friday, near its lowest point since the ad tech company went public six months ago.  The sell-off comes after a group of more than seven investors and senior executives cashed out to the tune of more than $150 million, as reported by InsiderTradingWire. Those transactions, which earned more than $14 million each for the company's top two executives, CEO George John and President Richard Frankel, took place between February 3 and February 7.
>
> *          *          *
>
> Wall Street can get jittery when insiders sell large stock volumes, although in Rocket Fuel's particular case it's not clear whether the stock's latest tumble is due to more insiders dumping smaller volumes of equity or (worse for Rocket Fuel) external investor fears that the insider trades signal *a lack of faith from senior management*. [Emphasis added].

75.     On May 8, 2014, Defendants caused the Company to announce its financial results for the first quarter ended March 31, 2014.  The Company reported a first quarter loss of $0.18 per share, which was a higher loss than consensus estimates, and reported revenue of $74.4 million, which was lower than consensus estimates of $76.2 million, though in line with the Company's January 22, 2014, and February 20, 2014 guidance.  The Company also provided a lower-than-expected revenue outlook for the second quarter of 2014 (forecast revenue of $88 - $92 million

versus consensus of $101.8 million), but reconfirmed its prior guidance for fiscal year of 2014 of $420-$435 million and adjusted EBITDA of $3.0 million to $6.0 million.  According to an analysis by <u>Zacks</u> published on May 12, 2014, the "considerable improvement in loss per share was attributable to a secondary public issue, which resulted in the number of shares increasing from 8,298 in the year-ago quarter to 34,033 shares in the reported quarter."

76.     On May 8, 2014, Defendants caused the Company to host a conference call with analysts following its First Quarter 2014 earnings announcement, in which John represented that "[o]ur artificial intelligence technology platform continues to drive superior results for our customers and produces leading margins for our business" and in which Bardwick reaffirmed the Company's financial guidance for 2014.  The Company attributed its lower-than-expected second quarter revenue guidance, in part, to competitive pressures, including customers moving towards in-house advertising solutions, and competition with advertising agencies with internal trading desks.

77.     None of the comments and representations made by John and Bardwick during the above-referenced conference call indicated that the lower customer sales were due to the quality of the Company's inventory or due to the Company's inability to detect and block ad fraud.

78.     The Company's common stock continued to trade at inflated levels by these statements.  While the price of Company shares did not increase, the artificial inflation in the Company's common stock continued to be maintained by Defendants' prior materially false and misleading statements and omissions.  Moreover, although the Company reiterated its Full Year 2014 guidance with its May 8, 2014 announcement, John later unwittingly acknowledged during a conference call on August 5, 2014, that "industry buzz this summer around bot traffic and low-quality ad space on digital exchanges [ ] has led some agency media buyers to begin questioning exchange-based buying generally."

79.     On May 9, 2014, the Company's stock price fell 21% from $27.81 to $21.83 in response to this news.  Despite the drop in the price, the fact that the Company had reiterated its aggressive 2014 full year guidance maintained the artificial inflation in the Company's stock price.

80.     At the May 14, 2014 SunTrust Robinson Humphrey Internet & Digital Media Conference, Bardwick was asked "how Rocket Fuel is differentiating [from competitors concerning online advertising fraud] and providing a cleaner experience for advertisers?" Bardwick responded that the Company's technology was "the best . . . in the industry around filtering the impressions that we buy on behalf of advertisers," further stating that "we have said publically that of the 40 billion impressions we see per day -- and that number is growing very quickly by the way -- we filter about a third of them off the top for quality reasons, which would include potentially fraud-related reasons."

81.     In response to a question regarding the Company's falling stock price, Bardwick stated:

> And this feels like -- you know there are companies that are doing extremely well. I wouldn't say we're one of the.  We've been hit pretty hard.  ***So it's pretty hard for me to understand what's got to do with Rocket Fuel and what's got to do with the market as a whole***.

> *       *       *

> Absolutely. You know things are easy when they're easy, right? The foundation of the Company is providing long-term value to advertisers, which will provide longterm value to investors.  None of that has changed.  The stock price reflects the market today.  ***Over time it will reflect what I believe will be our continuing very high growth rates, our continuing ability to satisfy advertisers in a way that others can't***.  And that will work out over time.  So when one goes public, you think it's for the long term.  And on weeks like this you just make sure that the employees know that, communicate that clearly to investors.  And most importantly you keep advertisers happy, you keep your customers happy, a things work out. [Emphasis added].

**The *Financial Times* Report on Rocket Fuel**

82.     On May 26, 2014, the Financial Times reported on Rocket Fuel:

> Part of a recent Mercedes-Benz online advertising campaign was viewed more often by automated computer programmes than by human beings, according to documents seen by the Financial Times.

> The ads were inadvertently placed on to fraudulent websites by Rocket Fuel, a Nasdaq-listed ad technology company that went public last September with a market capitalisation of nearly $1bn.

> ***The incident will intensify concerns about the prevalence of fraud in the fast growing online advertising market***, which expanded 15 per cent last year to $120bn.

COMPLAINT
CASE NO. 4:15-cv-4625

In Mercedes-Benz's case, the suspicious traffic was discovered in an investigation for the German carmaker by Telemetry, a UK company that specialises in detecting ad fraud.

In a sample of 365,000 ad impressions brokered by Rocket Fuel over three weeks, Telemetry found that *57 per cent were "viewed" by automated computer programs rather than real people*.

Mercedes said that over the whole of its campaign, the proportion of questionable impressions was less than 6 per cent, and that *Rocket Fuel 'refunded us for the suspect impressions'*. The carmaker added that it and its US advertising agency Merkley & Partners, which is part of Omnicom Group, have continued to work with Rocket Fuel.

There is no suggestion that Rocket Fuel, which acts as an intermediary between advertisers and online publishers, was aware that it was delivering its client's ads to fraudsters. The company buys ad inventory via ad exchanges, which are in turn plugged in to thousands of publishers.

*However the findings raise questions about Rocket Fuel's assertions on its website that it 'makes sure the 'bad actors' always leave empty-handed*.[13]

Rocket Fuel played down Telemetry's report, saying it was not sure that the figures were '100 per cent correct'. It said the findings came from a small sample and did not represent the type of traffic that normally passes through its systems.

To identify and block suspicious activity, Rocket Fuel uses a combination of its own technology and partnerships with third parties such as Double Verify and Integral Ad Science.

Rocket Fuel said that in February, it identified and rejected 500bn bid requests from online publishers because of inventory quality concerns.

Fraudsters are coming up with increasingly sophisticated ways to deceive online advertisers, using software that mimics the behaviour of a real person browsing the web.

Telemetry detected the bots by identifying anomalies in traffic to the ads. Virtually all of the suspect traffic came from five small internet service providers. And the computers "viewing" the ads used Linux, an operating system rarely used on desktops, though they attempted to disguise this by simulating popular web browsers that only work on Windows or Macs.

Telemetry said it had traced the ownership of the bot network to two people in the UK, who directed the bots to websites they owned,

---

[13]   http://rocketfuel.com/blog/rocket-fuel-brand-safety-series-suspicious-activity.

1    thereby making money from the ad sales.  The websites have since
2    disappeared.  [Emphasis added].

3    83.    On May 27, 2014, the Company criticized the <u>Financial Times</u> article. Specifically,

4    in the Company's online "Response to the <u>Financial Times</u>," the Company stated that "[b]ots are a

5    real problem" but less so than "sensational headlines on top of non-news," and that the Company

6    was able to "make good" the volumes of the fraudulent impressions that were detected by

7    repaying Mercedes.  In response to the Company's defense, Telemetry stated that Rocket Fuel had

8    been unable to identify ad fraud in its media campaigns:[14]

9    If an ad tech platform such as Rocket Fuel were unable to detect the
10    fraudulent impressions before we identified them **then what does
      that mean for campaigns that sit outside the sample that Telemetry
11    analyzed**?

*            *            *

12    For clarity, there is no suggestion that Rocket Fuel sold fraudulent
13    impressions willingly or knowingly **but what our investigations
      continue to highlight is the extent to which ad tech platforms
14    themselves claim to be 'brand safe' and immune to the articulate
      and unrelenting vehicles and instruments of online advertising
15    fraud.**  To what extent are they actually able to detect and therefore
      protect against this and how they can best help advertisers.
16    [Emphasis added].

17    84.    At a May 28, 2014 Raymond James Internet/Software Crossover Conference,

18    Bardwick and John continued to tout the Company's financial and technological performance.

19    Bardwick stated that "we've gotten bigger, and, again, we're guiding to $420 million to $435

20    million for this year," and "because we're remarkably good at managing large amounts of data and

21    then utilizing that to create ROI, it's a real advantage for us."

22    85.    Further, in a July 2, 2014 interview with Cory Johnson of <u>Bloomberg News</u>, John

23    stated in relevant part:

24    JOHNSON:  What  percentage  of  --  speaking  of  testing,  what
25    percentage of your ads do you think are viewed by bots?

26    JOHN:  So **we've done studies internally**.  We have a science team
      that's sort of our bot squad that tries to figure out what traffic is real
27    and what's not.  For viewers, if you're a publisher, you may be kind

28    _____
[14]    http://www.telemetry.com/responses.html.

of motivated to artificially inflate your traffic on your website to drive more money. And if advertisers and their parents aren't smart enough, they'll accidentally buy some of this bot traffic thinking it's real people. So with Rocket Fuel we throw away –

JOHNSON: Or they do it intentionally.

JOHN: Well, maybe. And *so at Rocket Fuel we throw over 40 percent of the opportunities we have to bid on ad space. We just throw it away because they don't pass our quality filters where either we think it's a bot or - or unsafe inventory, not a good website that a quality brand would want to see their ad on.* So it's pretty massive the amount of kind of stuff out there that you wouldn't really want to run a quality brand's ad on. [Emphasis added].

86.     Defendants knew or were reckless in not knowing that the Company's fraud detection capabilities were far more limited. By June 25, 2014, the Company quietly abandoned its mantra that the Company's "powerful technology . . . is able to identify and eliminate *all* threats before serving a single ad," and that its "three layers of defense that block bad sites and pages *before a single ad is ever served on them*." Instead, Defendants employed far less reckless language, stating that "Rocket Fuel is able to identify and eliminate threats before serving a single ad" and that its "three layers of defense proactively block[] bad sites and pages. . . ." (Emphasis added).

87.     On June 17, 2014, in a letter from the SEC concerning Rocket Fuel's Form 10-K, the SEC sought additional information from the Company regarding the consequences for delivering advertising spots or impressions that did not satisfy the campaign parameters specified by its customers. On July 1, 2014, Defendants caused the Company to respond to the SEC:

[T]he Company will have failed to deliver according to the terms of the IO [insertion order]. The form IO includes remedies for failure to deliver according to the specifications of the IO. However, those remedies are not defined as exclusive remedies in the standard terms and conditions, so if the Company was in breach of the IO terms and conditions, the advertiser could seek additional remedies. For example, the advertiser may refuse to pay the contractually stated price in the IO for the delivered impressions. The Company may also lose the business of that advertiser.

88.     On August 5, 2014, after the close of trading, Defendants caused the Company to announce that it expected 2014 revenue of $403 million to $427 million, down sharply from its recently-reiterated forecast of $420 million to $435 million. The same day, <u>The Wall Street</u>

Journal reported that "Rocket Fuel Inc. lowered its full-year revenue guidance for the year, pointing to **customer concerns about inventory quality**. . . ." (Emphasis added). During a same-day conference call with investors, John stated that there has been "a phenomena in our industry that hasn't been well understood," and claimed that the Company was "surprised by the strength of trends impacting our bookings in June [2014], and we now feel our full-year guidance should take into account slightly lower sales productivity based on the following three factors." One of those trends was "bot traffic and low-quality ad space on digital exchanges."

89.   The following day, on August 6, 2014, the Company's stock dropped from $24.75 to $17.05 – a 30% decline. Analysts were skeptical that Defendants had been caught by surprise by the impact of bot traffic on the Company's operations and financial performance and outlook. For example, Credit Suisse analyst Stephen asked "in regards to the industry concern around bot traffic, because it seems like the lack of ROI [return on investment] from bot-driven traffic should already be well reflected in the price. So can you add some additional color on the advertising concerns here?" In response, John conceded the analyst's skepticism even as he tried to misleadingly characterize the ad tech industry's longstanding bot traffic issue as a "new thing":

> [F]rom the customer perspectives, it's I think a phenomena in our industry that hasn't been well understood I think by a lot of advertisers. I think agencies have understood, but maybe hadn't really filtered all the way down to advertisers yet. So it's going through a brief period of time here where it's the **new thing** to be confused about and try to understand. **But you're right**, ultimately, that it's only a piece of a puzzle and if you're still able to generate better ROI [return on investment], **you would think you would only do that if you weren't (technical difficulty) robots since they don't buy things**. [Emphasis added].

90.   Also, at the August 11, 2014 Pacific Crest Global Technology Leadership Forum, Frankel stated in relevant part:

> Yes. **Bots and fraud on the Internet are a very short-term situation.** It's not a problem that is unique to Rocket Fuel; far from it. It's affecting the entire industry.
>
> And so we've actually invested quite a bit at Rocket Fuel to weed out robot impressions so that we only actually show our clients' ads to actual human beings. Not everyone in the industry has invested as much as we have, and **some of our technology, actually, is**

*especially well suited to identifying nonhuman behavior squelching it.*

But like I said, ***I think this is a relatively short-term situation***. We've been through a few cycles in this way already in digital. Search went through a phase of there being a lot of worry, and the big search players figured out how to effectively combat the fraud that was going on in their sector. And then folks stopped talking about it and went on to the next problem. I think that's what we are going to see here.

***So I see it as a short-term issue.*** There will always be bad actors who are looking to take advantage of marketplaces, but as the marketplace matures and grows up, we are going to have a fairly consistent response to it. And I think the marketers will get comfortable. Fundamentals -- the fundamentals of marketplaces are going to drive -- are going to keep driving growth in this sector, and fundamentals of marketplaces are really, really simple.

Rocket Fuel is a marketplace actor, and the marketplace is multiple buyers for each seller. So the sellers like that; the buyers like that; the marketers who get the value out of it like that. So that marketplace dynamic is very, very hard to stop. And companies like Rocket Fuel are investing in making sure that the bad actors are kept to a minimum so that the good actors -- and that's most of the folks in the space -- can have their businesses. [Emphasis added].

91.     On August 15, 2014, Defendants caused the Company to issue a press release contradicting its own CEO and President, representing that "[a]dvertising fraud is not a new problem" and that "Rocket Fuel has addressed for years."[15]

92.     While publicly touting the Company's prospects and performance during the Relevant Period, Defendants knew or were reckless in not knowing that the Company's current and future financial performance was in jeopardy due to the Company's inability to adequately combat ad fraud. Rather than disclose the depth and pervasiveness of the Company's bot traffic challenges to the public, Defendants provided bullish full year 2014 guidance in the fourth quarter of 2013 and the first quarter of 2014, and throughout the second quarter of 2014, only to revise that full year 2014 guidance a short time later with the release of the Company's second quarter financials of 2014.

---

[15]     http://www.marketwatch.com/story/media-alert-rocket-fuel-expert-shares-best-practicesto-combat-digital-advertising-fraud-with-the-bbc-2014-08-15.

COMPLAINT
CASE NO. 4:15-cv-4625

93.     On August 14, 2014, Defendants caused the Company to file its Quarterly Report with the SEC on Form 10-Q.  For the first time ever the Company warned investors about what it had known all along – namely that if it served advertisers' advertisements on undesirable websites or failed to detect fraud "including bot traffic," the Company's reputation and business operations would suffer.

94.     Finally underscoring the severity of the ad fraud issue, on August 15, 2014, Defendants caused the Company to issue a press release entitled *Media Alert: Rocket Fuel Expert Shares Best Practices to Combat Digital Advertising Fraud With the BBC*, in which it finally warned investors that: "[a]ccording to the Interactive Advertising Bureau, advertising fraud could cost advertisers $11 billion dollars alone this year and 25-50% of digital spend could be wasted on ads that are never viewed by humans."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

95.     Defendants' misrepresentations concerning the Company's financial and business condition, including its forecasted financial and business condition as alleged herein, were materially false and misleading when made because Defendants knew or were deliberately reckless in not knowing that: (a) a large percentage of the ads the Company brokered were being "viewed" by automated fraudulent computer programs, rather than real people, such that the Company's operations and financial performance were in jeopardy; (b) the Company's revenue growth was negatively impacted due to its inability to identify and eliminate bot traffic for its customers; (c) the Company's revenue growth was negatively impacted due to customers deciding to opt out of using the Company's services and bringing similar services in house; and (d) the Secondary Offering was designed to enable Company insiders to unload their shares at artificially inflated prices.  For all the foregoing reasons, the Company's statements as alleged below were materially false and misleading when made.

**The Company's IPO**

96.     On September 20, 2013, Defendants caused the Company to file a Prospectus with the SEC pursuant to Rule 424(b)(4).  The 2013 Prospectus advised readers that: "For further information with respect to us or our common stock, we refer you to the [2013] registration

statement . . . ."  As evidence that the Company understood the importance of fraud detection, the 2013 Prospectus further stated in the "risk disclosures" that: "[i]f we fail to detect fraud or serve our advertisers' advertisements on undesirable websites, our reputation will suffer, which would harm our brand and reputation and negatively impact our business, financial condition and results of operations."  In truth, the Company knew that this was not merely a hypothetical risk and was already happening.  An accurate risk disclosure would have warned investors that "when" and "as" the Company failed to detect fraud, the Company's business and financial condition would continue to worsen.

97.     Moreover, while the Company's 2013 Prospectus also represented that the Company "use[d] proprietary technology to detect click fraud and block inventory that we know or suspect to be fraudulent, including 'tool bar' inventory, which is inventory that appears within an application . . . ."  Further, the Company failed to disclose anywhere in the 2013 Prospectus the effects from "bot traffic" that was already negatively impacting the Company.  It was not until after August 14, 2014, that Defendants finally specifically warned investors for the first time about "bot traffic" in its SEC filings.  To the contrary, on or about June 25, 2014, the Company assured investors that the Company could "block bad sites and pages ***before we ever serve a single ad on them.***"

98.     In the 2013 Prospectus, the Company misrepresented that its "real-time optimization engine delivers digital advertising campaigns that are effective and efficient" and that by "[l]everaging the massive amounts of inventory available through real-time advertising exchanges, our solution enables advertisers to efficiently connect with large audiences while it maintains a focus on results-driven optimization."

99.     The statements outlined above were materially false and misleading because Defendants knew or were reckless in not knowing: (a) the Company's proprietary technology was unable to adequately or effectively detect and eliminate digital ad fraud, including bot traffic, which in turn was negatively impacting the Company's operations and financial performance; (b) attempting to traffic 500 billion ad impressions per month made it a virtual certainty that the Company would fail to detect ad fraud at levels acceptable to its customers; and (c) a material

percentage of the ads Rocket Fuel brokered were being "viewed" by automated fraudulent computer programs, rather than real people.  Further, Defendants failed to disclose information about the impact of bot traffic in a manner that would have warned investors that the Company's current and future financial performance was in jeopardy.

**The Company's Third Quarter 2013**

100.    On November 6, 2013, the Company posted on its website that its "powerful Advertising That Learns® technology uses real-time data points to recognize these bad actors and block them at the source."   Specifically, the Company misrepresented that "Rocket Fuel undermines fraudulent practices and makes sure con artists always leave empty handed.  Using the same powerful technology that optimizes our clients' campaigns, Rocket Fuel is able to identify and eliminate all threats before serving a single ad."

101.    On November 7, 2013, Defendants caused the Company to issue a press release that it filed with the SEC on Form 8-K that stated "Rocket Fuel Reports Record Revenue in Third Quarter 2013."   John stated that "Rocket Fuel continued its strong growth during the third quarter, as revenue grew 132% to $62.5 million."   On November 13, 2013, Defendants caused the Company to file with the SEC the quarterly report for the Third Quarter ending September 30, 2013 on Form 10-Q, which was signed by Bardwick.  The Company's Quarterly Report reiterated the Company's third quarter and full year of 2013 performance.

102.    The statements outlined above were materially false and misleading because Defendants knew or were reckless in not knowing that: (a) the Company's inability to adequately detect and eliminate digital ad fraud, including bot traffic, was negatively impacting the Company's operations and financial performance; (b) attempting to traffic 500 billion ad impressions per month made it a virtual certainty that the Company would fail to detect ad fraud at levels acceptable to its customers; (c) a material percentage of the ads the Company brokered were being "viewed" by automated fraudulent computer programs, rather than real people; and (d) the Company's revenue growth was negatively impacted due to customers deciding to opt out of utilizing the Company's services and bringing similar services in-house.  In addition, Defendants

1   knew or were reckless in not knowing that the impact of bot traffic would have on the current and

2   future financial performance of the Company.

3   **December 4, 2013 Investor Conference**

4        103.   Defendants continued to represent that its technology differentiated it from other ad

5   tech companies that were less likely to identify and eliminate bot traffic.  On December 4, 2013,

6   Bardwick stated at the NASDAQ OMX Investor Program:

> We are looking today at 38 billion impressions a day, opportunities to buy impressions.  Typically, the first step is we filter those. We're very good about -- we have proprietary technology about filtering for bots. We also filter for quality.  Obviously, we work with big-name advertisers who are very concerned about the quality of where their advertising goes.

104.   At the NASDAQ OMX Investor Program, Bardwick responded to the question "[h]ow big a problem are bots in your industry?  Are you able to quantify that?  I mean, how do you convince your advertisers that your product solution," by comparing the ad tech space to the mortgage industry, stating "[a]ny industry where there's a lot of money to be made, be it mortgage market, unfortunately, or even digital advertising, unfortunately, it can attract fast operators, if you will."  He further stated:

> We have proprietary technology.  We work very hard to filter out bots, and there are two reasons for that.  First this team – we've been through this before.  We want to be doing this 10 years from now and with a much larger company, and being the good guys in the industry is the way to make that happen.  The other thing, of course, is just it makes customers happy and it produces the best economic return.
>
> I think there will always be a bit of a cat-and-mouse game as there are, say, in security issues. But as the advertisers get smarter and smarter – and they are getting smarter every day -- whether they're aware that they're filtering it out or not, if they're buying bot traffic, they will migrate away from companies that deliver that to them, because ultimately it has no value.
>
> So, again, I think there'll be a cat-and-mouse game, but I think *the advertisers and then certain players like us will continue to stay ahead of the people who are trying to make a quick buck*. [Emphasis added].

105.     The statements referenced above were materially false and misleading because Defendants knew or were reckless in not knowing that: (a) the Company's inability to adequately detect and eliminate digital ad fraud, including bot traffic, was already negatively impacting the Company's operations and financial performance; (b) attempting to traffic 500 billion ad impressions per month made it a virtual certainty that the Company would fail to detect ad fraud at levels acceptable to its customers; and (c) a material percentage of the ads the Company brokered were being "viewed" by automated fraudulent computer programs, rather than real people. In addition, Defendants failed to disclose information about the impact of bot traffic in a manner that would have warned investors that the Company's current and future financial performance was in jeopardy.

**The Company's Fourth Quarter 2013 And Fiscal Year 2013**

106.     On January 22, 2014, Defendants caused the Company to release a press release, announcing its *Preliminary Fourth Quarter 2013 Financial Results and Initial 2014 Guidance*.

107.     On February 20, 2014, in addition to announcing its Fourth Quarter 2013 results, the Company reiterated its January 22, 2014 guidance for the first quarter and full year of 2014 outlook.

108.     On February 20, 2014, the Company hosted a conference call with analysts following its fourth quarter 2013 earnings announcement, where John represented that the Company's "AI and big data platform is a competitive advantage enabling us to transform advertising and gain market share."

109.     On February 28, 2014, Defendants caused the Company to file its Annual Report for 2013 on Form 10-K with the SEC, which was signed by John and Bardwick.  The Company's 2013 Annual Report provided the same materially misleading "risk disclosure".  The Company's 2013 Annual Report on Form 10-K also made similar representations in the "Our Solution" section.

110.     The statements above were materially false and misleading because Defendants knew or were reckless in not knowing that: (a) the Company's inability to adequately detect and eliminate digital ad fraud, including bot traffic, was already negatively impacting the Company's

operations and financial performance; (b) attempting to traffic 500 billion ad impressions per month made it a virtual certainty that the Company would fail to detect ad fraud at levels acceptable to its customers; (c) a material percentage of the ads the Company brokered were being "viewed" by automated fraudulent computer programs, rather than real people; and (d) the Company's revenue growth was negatively impacted due to customers deciding to opt out of utilizing the Company's services and bringing similar services in-house.  In addition, Defendants failed to disclose information about the impact of bot traffic in a manner that would have warned investors that the Company's current and future financial performance was in jeopardy.

**The Company's Secondary Offering Materials**

111.    On January 22, 2014, Rocket Fuel announced a Secondary Offering.  On January 27, 2014, Rocket Fuel filed a Registration Statement on Form S-1/A with the SEC relating to its proposed Secondary Offering via a Prospectus that was filed with the SEC pursuant to Rule 424(b)(4) on January 31, 2014.

112.    The 2014 Registration Statement and 2014 Prospectus contained the same misleading "risk disclosure" alleged above.  Further, in the section of the 2014 Prospectus and 2014 Registration Statement entitled "Our Solution," the Company made similar representations as alleged above.

113.    The statements outlined above were materially false and misleading because Defendants knew or were reckless in not knowing that: (a) the Company's inability to adequately or effectively detect and eliminate digital ad fraud, including bot traffic, was already negatively impacting the Company's operations and financial performance; (b) attempting to traffic 500 billion ad impressions per month made it a virtual certainty that the Company would fail to detect ad fraud at levels acceptable to its customers; (c) a material percentage of the ads the Company brokered were being "viewed" by automated fraudulent computer programs, rather than real people; and (d) Rocket Fuel's revenue growth was negatively impacted due to customers deciding to opt out of using the Company's services and bringing similar services in-house.  In addition, Defendants failed to disclose information about the impact of bot traffic in a manner that would

COMPLAINT
CASE NO. 4:15-cv-4625

1   have warned investors that the Company's current and future financial performance was in

2   jeopardy.

3   **March 11, 2014 Conference**

4   114.   On March 11, 2014, at the Piper Jaffray Technology, Media and

5   Telecommunications Conference, in response to a question concerning bots, Bardwick stated:

> Question is bots within the online advertising industry. Unfortunately, any industry in which there is significant transactional volume can attract bad actors. They have been attracted from time to time in online advertising. With respect to bots, first we are very proud of the fact that we invest significantly in bot-filtering technology, in part because we want to be -- because as management teams, we want to be the best partners for our customers and also because bot traffic does not drive economic results for our advertisers.
>
> ***We have a lot of proprietary technology that we have implemented. We actually filter initially about a third of the 40 billion impressions a day that we see. Some of it is bot; some of it is brand-related.*** But over time, I think that that kind of traffic will become a lesser issue because advertisers are getting smarter. We talked about the tailwind of our TV, of programmatic. Another tailwind in our industry is CMOs, chief marketing officers focused on ROI. And if you're generating clicks from bots, there's no subsequent economic event. And so, we see campaigns moving away from CPC or cost per click to selling goods and services, and we think that's good for us and good for the industry. [Emphasis added].

18   115.   The statements outlined above were materially false and misleading because

19   Defendants knew or were reckless in not knowing that: (a) the Company's inability to adequately

20   detect and eliminate digital ad fraud, including bot traffic, was already negatively impacting the

21   Company's operations and financial performance; (b) attempting to traffic 500 billion ad

22   impressions per month made it a virtual certainty that the Company would fail to detect ad fraud at

23   levels acceptable to its customers; (c) a material percentage of the ads the Company brokered were

24   being "viewed" by automated fraudulent computer programs, rather than real people; and (d) the

25   Company's revenue growth was negatively impacted due to customers deciding to opt out of

26   utilizing the Company's services and bringing similar services in-house. In addition, Defendants

27   failed to disclose information about the impact of bot traffic in a manner that would have warned

28   investors that the Company's current and future financial performance was in jeopardy.

COMPLAINT
CASE NO. 4:15-cv-4625

1

**The Company's First Quarter 2014**

2      116.    On May 8, 2014, Defendants caused the Company to announce its financial results

3  for the first quarter ended March 31, 2014.  The Company reported a first quarter loss of $0.18 per

4  share, which was a higher loss consensus estimates, and reported revenue of $74.4 million, which

5  was lower than consensus estimates of $76.2 million, though in line with the Company's January

6  22, 2014, and February 20, 2014 guidance.  The Company also provided a lower-than-expected

7  revenue outlook for the second quarter of 2014 (forecast revenue of $88 - $92 million versus

8  consensus of $101.8 million), but reconfirmed its prior guidance for fiscal year of 2014 of $420-

9  $435 million and adjusted EBITDA of $3.0 million to $6.0 million.

10      117.    On May 15, 2014, Defendants caused the Company to file a Quarterly Report for

11  the first quarter of 2014 on Form 10-Q with the SEC, which was signed by Bardwick, which

12  included the same materially misleading "risk disclosure" statements.

13      118.    The statements outlined above were materially false and misleading because

14  Defendants knew or were reckless in not knowing that: (a) the Company's inability to adequately

15  detect and eliminate digital ad fraud, including bot traffic, was already negatively impacting the

16  Company's operations and financial performance; (b) that attempting to traffic 500 billion ad

17  impressions per month made it a virtual certainty that the Company would fail to detect ad fraud at

18  levels acceptable to its customers; (c) a material percentage of the ads the Company brokered were

19  being "viewed" by automated fraudulent computer programs, rather than real people; and (d) the

20  Company's revenue growth was negatively impacted due to customers deciding to opt out of

21  utilizing the Company's services and bringing similar services in-house.  In addition, Defendants

22  failed to disclose information about the impact of bot traffic in a manner that would have warned

23  investors that the Company's current and future financial performance was in jeopardy.

24

25

26  ///

27  ///

28  ///

COMPLAINT
CASE NO. 4:15-cv-4625

1

**May 14, 2014 Conference**

2        119.   At the May 14, 2014 SunTrust Robinson Humphrey Internet & Digital Media

3    Conference, questions were asked of Bardwick: "how Rocket Fuel is differentiating [from

4    competitors concerning online advertising fraud] and providing a cleaner experience for

5    advertisers."  Bardwick responded:

6               I firmly believe that we do, if not the best, one of the best jobs in the
                industry around filtering the impressions that we buy on behalf of
7               our advertisers.  We do that because it's the right thing to do and we
                do that because it achieves economic value for our advertisers.
8               Delivering clicks, if they're fraudulent clicks, that is bot clicks or
                otherwise, there's no economic value there and our revenue
9               retention will not be driven by no economic value.  We want to
                deliver economic value.  *So our approach is -- and we've got some*
10              *proprietary things we do that we don't detail in public, that we do*
                *in order to make sure that we're delivering quality results to the*
11              *advertisers.*

12              *And we have said publically that of the 40 billion impressions we*
                *see per day -- and that number is growing very quickly by the way -*
13              *- we filter about a third of them off the top for quality reasons,*
                *which would include potentially fraud-related reasons*.  [Emphasis
14              added].

15

16       120.   The statements above were materially false and misleading because the Defendants

17   knew or were reckless in not knowing that: (a) the Company's inability to adequately detect and

18   eliminate digital ad fraud, including bot traffic, was already negatively impacting the Company's

19   operations and financial performance; (b) attempting to traffic 500 billion ad impressions per

20   month made it a virtual certainty that the Company would fail to detect ad fraud at levels

21   acceptable to its customers; (c) a material percentage of the ads the Company brokered were being

22   "viewed" by automated fraudulent computer programs, rather than real people; and (d) the

23   Company's revenue growth was negatively impacted due to customers deciding to opt out of

24   utilizing the Company's services and bringing similar services in-house.  In addition, Defendants

25   failed to disclose information about the impact of bot traffic in a manner that would have warned

26   investors that the Company's current and future financial performance was in jeopardy.

27   ///

28   ///

COMPLAINT
CASE NO. 4:15-cv-4625

**May 8, 2014 Partial Corrective Disclosure**

121.    On May 8, 2014, Defendants caused the Company to announce its financial results for the first quarter ended March 31, 2014.  For the first quarter, the Company reported revenues of $74.4 million and an adjusted EBITDA of a loss of $3.7 million.  The Company disappointed the market with its second quarter forecast. For the Second Quarter 2014, the Company forecasted revenues in the range of $88.0 million to $92.0 million, which, at the midpoint, was 12% below the market consensus of $101.8 million.  Adjusted EBITDA for the second quarter was forecasted to be in the range of a loss of $6.0 million to a loss of $4.5 million, compared to Street expectations for positive $0.2 million.  Despite the lower-than-expected second quarter revenue projections, the Company reiterated its full-year 2014 revenue guidance (of $420-$435 million) and adjusted EBITDA guidance (of $3.0-$6.0 million), stating "we expect revenue growth in the latter half of the year to increase slightly from our expected Q2 growth rate due to a number of factors, including the impact of recent sales hiring and expanded offerings that enhance our current product suite."

122.    On May 9, 2014, the Company's stock price dropped 21.5% or $5.98 (from a close of $27.81 on May 8, 2014 to a close of $21.83 on May 9, 2014).  Trading volume was over 9 million shares.

123.    News commentary attributed the Company's stock price drop, which began after market close on May 8, 2014, to the Company's disappointing Second Quarter 2014 revenue forecast.  In its conference call following its earnings release, the Company attributed its lower than expected second quarter revenue guidance, in part, to competitive pressures, including customers moving towards in-house advertising solutions, and competition with advertising agencies with internal trading desks, partially revealing that "[w]e also see some customers and agencies wanting to bring advertising technology in-house.  They feel it is strategic for them to understand and develop direct expertise on how to manage the customer data and how to use it to drive a well targeted digital campaign. . . .   Across the board, customers asked for more insights and access to data to understand the performance we are driving, and the audiences we're reaching for them."  These statements partially revealed the issues the Company was then having with

customers becoming increasingly concerned about bot traffic without revealing the full extent of the Company's then existing problem. However, the artificial inflation in the Company's common stock continued to be maintained by Defendants' prior materially false and misleading statements and omissions.

124.    In response to the Company's disappointing second quarter guidance on May 8, 2014, several analysts downgraded their ratings and lowered their earnings estimates for the Company, citing concerns over competitive pressures.  For example, Evercore stated that the Company's May 8 disclosures were the "first signs of headwinds" noting an industry shift towards "Software as a Service" solutions, and lowered its earnings estimate and price target for the Company.  Piper Jaffray reduced its 2014 and 2015 revenue expectations for the Company, stating that "investors will likely look at the company's numbers with skepticism."

**August 5, 2014 Corrective Disclosure**

125.    On August 5, 2014, Defendants caused the Company to announce its financial results for Second Quarter 2014, and sharply reduced its Full Year 2014 revenue and earnings guidance.  The same day, The Wall Street Journal reported that "Rocket Fuel Inc. lowered its full year revenue guidance for the year, pointing to ***customer concerns about inventory quality*** . . . ." During a same-day conference call with investors, John suggested that concerns about fraudulent traffic was "a phenomena in our industry that hasn't been well understood," and tried to claim that the Company was "***surprised*** by the strength of trends impacting our bookings in June [2014], and we now feel our full-year guidance should take into account slightly lower sales productivity based on the following three factors."  One of those trends was "bot traffic and low-quality ad space on digital exchanges."

126.    The Company's second quarter financial results were slightly better than expected. However, the Company reduced its 2014 revenue guidance by approximately 8% to a range of $385–$405 million (excluding expected revenue from newly announced acquisition of [x+1]), down from the previously forecasted range of $420–$435 million.  The Company's projected revenue growth for the second half of 2014 was reduced to 55% year over year, compared to previous guidance of 74%. Adjusted EBITDA was lowered to a loss in the range of $8.0 million to

$5.0 million on a standalone basis, down from a projected profit in the range of $3.0 million to $6.0 million.  The Company also disclosed its intent to acquire [x+1], a provider of programmatic marketing and data management solutions, in a cash and stock transaction with an enterprise value of approximately $230 million.

127.   On August 6, 2014, the Company's stock dropped from $24.75 to $17.05 – a decline of approximately 30%.  Analysts were skeptical that Defendants had been caught by surprise by the impact of bot traffic on the Company's operations, financial performance and outlook.   For example, Piper Jaffray stated that the Company's 2014 guidance was "disappointing" and adjusted its model significantly downward to reflect "slower growth rates for the core. . . ."  Further, Oppenheimer lowered its price target for the Company to $31 from $44 in response to the Company's reduced guidance.  There was also unusually high trading volume on August 6, 2014, with total trading volume of over six million shares.

128.   Regarding its reduced revenue guidance, the Company stated that "advertiser commitments in the latter part of the second quarter for future advertising campaigns were lower than previous internal forecasts."  The Company attributed the drop in advertiser commitments to "a number of expanding trends, including:" (a) "tighter control of client spend by the agencies' internal trading desks;" (b) "a shift toward direct licensing by advertisers;" and (c) "recent customer concerns about inventory quality on exchanges that impact the entire industry."  The Company added that "industry buzz this summer around bot traffic and low-quality ad space on digital exchanges, which has led some agency media buyers to begin questioning exchange-based buying generally."

129.   August 5, 2014, was the first time the Company admitted that concerns over bot traffic and low quality ad space was negatively affecting its ability to sell its products to advertisers and ad agencies, and, in turn, its revenue projections.  This disclosure informed the market that, contrary to the alleged misrepresentations made during the Relevant Period, advertiser and agency concerns regarding ad fraud had been negatively impacting the Company's revenue growth and operations.

COMPLAINT
CASE NO. 4:15-cv-4625

130. The other factors cited by the Company as contributing to its reduction in Full Year 2014 revenue guidance (*i.e.*, the marketability of the Company's products to advertising agencies with internal trading desks, and an advertiser/agency shift towards managing ad campaigns in-house) was not new news to the market. These are the same competitive pressures cited by the Company in its first quarter earnings release. Nonetheless, these factors, due to Defendants' undisclosed failure to "eliminate" bot traffic, contributed to the Company's negative financial performance.

131. The decline in the price of the Company stock on May 9, 2014 and on August 6, 2014, following it first-quarter and second-quarter earnings releases, respectively, was immediate and significant. There was extraordinarily heavy trading volume on both of these days. The May 9, 2014, and August 6, 2014 declines in the Company's stock prices were clearly in response to the Company's unanticipated reductions in revenue and earnings guidance, due to Defendants' undisclosed failure to "eliminate all" bot traffic. There was no other negative confounding firm specific information released that day.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

132. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties, gross mismanagement, and unjust enrichment by Defendants.

133. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

134. Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

135. During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of Defendants John, Frankel, Bostrom, Codd, Ericson, Gardner, Kokich, and Zweben. Because of the facts set forth throughout this Complaint, demand on the

COMPLAINT
CASE NO. 4:15-cv-4625

1   Company Board to institute this action is not necessary because such a demand would have been a

2   futile and useless act.

3        136.   The Company Board is currently comprised of eight (8) members – Defendants

4   John, Frankel, Bostrom, Codd, Ericson, Gardner, Kokich, and Zweben.  Thus, Plaintiff is required

5   to show that a majority of the Demand Defendants, *i.e.*, four (4), cannot exercise independent

6   objective judgment about whether to bring this action or whether to vigorously prosecute this

7   action.

8        137.   The Demand Defendants either knew or should have known of the false and

9   misleading statements that were issued on the Company's behalf and took no steps in a good faith

10  effort to prevent or remedy that situation.

11       138.   The Demand Defendants (or at the very least a majority of them) cannot exercise

12  independent objective judgment about whether to bring this action or whether to vigorously

13  prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this

14  Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on

15  the Board to initiate this action because making a demand would be a futile and useless act.

16       139.   Each of the Demand Defendants approved and/or permitted the wrongs alleged

17  herein to have occurred and participated in efforts to conceal or disguise those wrongs from the

18  Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs

19  complained of herein, and are therefore not disinterested parties.

20       140.   Each of the Demand Defendants authorized and/or permitted the false statements to

21  be disseminated directly to the public and made available and distributed to shareholders,

22  authorized and/or permitted the issuance of various false and misleading statements, and are

23  principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully

24  prosecute such a suit even if they instituted it.

25       141.   Because of their participation in the gross dereliction of fiduciary duties, and

26  breaches of the duties of due care, good faith, and loyalty, John is unable to comply with his

27  fiduciary duties and prosecute this action.  He is in a position of irreconcilable conflict of interest

28

COMPLAINT
CASE NO. 4:15-cv-4625

1    in terms of the prosecution of this action and defending himself in the securities fraud class action

2    lawsuit brought under the Securities Exchange Act of 1934.

3         142.    Further, Defendants Ericson, Gardner, John, Frankel, and Zweben sold Company

4    stock under highly suspicious circumstances.    Defendants John and Frankel, as executive

5    directors, possessed material (non-public) information and used that information to benefit

6    themselves.   Defendants Ericson, Gardner, and Zweben, as directors, possessed material (non-

7    public) information and used that information to benefit themselves.   These defendants sold stock

8    based on this knowledge of material (nonpublic) information regarding the severe prevalence of

9    bot traffic in online advertising, the Company's inability to block or track fraudulent traffic, the

10   impending loss of customers, and the impending decrease in the value of their holdings of Rocket

11   Fuel.   Accordingly, Defendants Ericson, Gardner, John, Frankel, and Zweben face a substantial

12   likelihood of liability for breach of their fiduciary duty of loyalty.   Any demand upon these

13   defendants is futile.

14                   **The Demand Defendants Are Not Independent or Disinterested**

15   **Defendant John**

16        143.    Defendant John is not disinterested or independent, and therefore, is incapable of

17   considering demand because John (as Chief Executive Officer) is an employee of the Company

18   who derives substantially all of his income from his employment with Rocket Fuel, making him

19   not independent.   As such, John cannot independently consider any demand to sue himself for

20   breaching his fiduciary duties to Rocket Fuel, because that would expose him to liability and

21   threaten his livelihood.

22        144.    Accordingly, John lacks independence from Defendants Ericson and Bostrom,

23   defendants who are not disinterested and who exert influence over defendant John's compensation

24   by virtue of their positions as representing the entire Compensation Committee.

25        145.    This lack of independence and financial benefits received by John renders him

26   incapable of impartially considering a demand to commence and vigorously prosecute this action.

27        146.    Further, John received from the Company $4,880,202 in compensation in 2014,

28   including salary of $376,590, stock awards of $562,760, and option awards of $3,940,852.   He

COMPLAINT

CASE NO. 4:15-cv-4625

beneficially owns 7.87%, or 3,403,470 shares, of Company common stock.  As the leader of the Company who was the most responsible for the Company's fraud, and as the maker of the false and misleading statements of material fact as alleged herein, John breached his fiduciary duties. As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, John knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.

147.    Further, during the Relevant Period, on the basis of inside, non-public material information, John sold 307,877 shares during the Secondary Offering at artificially inflated prices, for gross proceeds of approximately $17.9 million, or more than nine times his total 2013 annual compensation of $1.9 million.  Defendant John did not purchase any Rocket Fuel shares on the open market at any point during the Relevant Period.  Because of his senior position with the Company, John possessed the power and authority to control the contents of the Company's press releases, investor and media presentations, and all filings Rocket Fuel made with the SEC during the Relevant Period.

**Defendant Frankel**

148.    Defendant Frankel is not disinterested or independent, and therefore, is incapable of considering demand because Frankel (as President and CFO) is an employee of the Company who derives substantially all of his income from his employment with Rocket Fuel, making him not independent.  As such, Frankel cannot independently consider any demand to sue himself for breaching his fiduciary duties to Rocket Fuel, because that would expose him to liability and threaten his livelihood.

149.    Accordingly, Defendant Frankel lacks independence from Defendants Ericson and Bostrom, defendants who are not disinterested and who exert influence over Frankel's compensation by virtue of their positions as representing the entire Compensation Committee.

150.    This lack of independence and financial benefits received by Frankel renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

151.    Further, Frankel received from the Company $2,923,397 in compensation in 2014, including salary of $372,214, and option awards of $2,551,183.  He beneficially owns 6.27%, or

COMPLAINT
CASE NO. 4:15-cv-4625

$2,655,232 shares, of Company common stock.  As a leader of the Company who was the most responsible for the Company's fraud, and as the maker of the false and misleading statements of material fact as alleged herein, Frankel breached his fiduciary duties.  As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Frankel knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.

152.    Further, during the Relevant Period, on the basis of inside, non-public material information, Frankel sold 254,323 shares during the Secondary Offering at artificially inflated prices, for gross proceeds of approximately $14.8 million, or close to 10 times more than his total 2013 annual compensation of $1.5 million.  Frankel did not purchase any Rocket Fuel shares on the open market at any point during the Relevant Period.  Because of his senior position with the Company, Frankel possessed the power and authority to control the contents of the Company's press releases, investor and media presentations, and all filings Rocket Fuel made with the SEC during the Relevant Period.

**Defendant Ericson**

153.    While in possession of material, non-public information concerning Rocket Fuel's true business health, Ericson sold 1,656,776 shares of his stock for $101,063,336 in proceeds.

154.    As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Ericson knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.  As a result of Ericson's substantial equity interest in the Company, Ericson is beholden to Defendants John and Frankel and has a vested interest in causing the Company stock price to be as high as possible.

**Defendant Gardner**

155.    While in possession of material, non-public information concerning Rocket Fuel's true business health, Gardner sold 407,693 shares of his stock for $23,750,155 in proceeds.

156.    As the most plausible inference is that the fraud alleged herein was widespread and systemic at the Company, Gardner knowingly engaged in, facilitated, concealed, and failed to disclose the fraud, or recklessly turned a blind eye to it.  As a result of Gardner's substantial equity

COMPLAINT

CASE NO. 4:15-cv-4625

1  interest in the Company, Gardner is beholden to Defendants John and Frankel and has a vested

2  interest in causing the Company stock price to be as high as possible.

3  **Defendant Zweben**

4  157.    While in possession of material, non-public information concerning Rocket Fuel's

5  true business health, Zweben sold 12,996 shares of his stock for $757,081 in proceeds.

6  158.    As the most plausible inference is that the fraud alleged herein was widespread and

7  systemic at the Company, Zweben knowingly engaged in, facilitated, concealed, and failed to

8  disclose the fraud, or recklessly turned a blind eye to it.  As a result of Zweben's substantial equity

9  interest in the Company, Zweben is beholden to Defendants John and Frankel and has a vested

10  interest in causing the Company stock price to be as high as possible.

11  **Defendants Bostrom, Codd and Kokich**

12  159.    Defendants Bostrom, Codd and Kokich are named defendants in at least one related

13  federal securities action.  The federal securities action alleges, based on claims of strict liability or

14  negligence under the Securities Act, that Bostrom, Codd and Kokich each signed one or more of

15  the IPO Materials and Secondary Offering Materials, and issued, caused to be issued and

16  participated in the issuance of IPO Materials and Secondary Offering Materials which contained

17  statements of material fact, omitted to state other facts necessary to make the statements not

18  misleading, and omitted to state material facts required to be stated therein.

19  160.    In light of the federal securities action, it is not possible for Bostrom, Codd and

20  Kokich in this case to consider a demand impartially.  If the Company presses forward with its

21  rights of action against Bostrom, Codd and Kokich in this case, then the Company's efforts would

22  undercut or even compromise the defense of the federal securities action.  Thus, demand is futile.

23  **COUNTS**

24  **FIRST CAUSE OF ACTION**

25  **Against All Defendants for Breach of Fiduciary Duties**

26  161.    Plaintiff incorporates by reference and re-alleges each and every allegation

27  contained above, as though fully set forth herein.

28

COMPLAINT
CASE NO. 4:15-cv-4625

162.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

163.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

164.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

165.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

166.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**SECOND CAUSE OF ACTION**

**Against All Defendants for Gross Mismanagement**

167.     Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

168.     By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

COMPLAINT
CASE NO. 4:15-cv-4625

- 43 -

169.    As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

170.    Because of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

### THIRD CAUSE OF ACTION

### Against Insider Selling Defendants for Unjust Enrichment

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    By their wrongful acts and the omissions of material fact that they caused to be made, the Insider Selling Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

173.    The Insider Selling Defendants sold Rocket Fuel stock while in possession of material adverse non-public information that artificially inflated the price of Rocket Fuel stock. As a result, Defendants Ericson, Gardner, John, Frankel, Bardwick, and Zweben profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

174.    Plaintiff, as a shareholder and a representative of the Company, seeks restitution from the Insider Selling Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Insider Selling Defendants due to their wrongful conduct and breach of their fiduciary duties.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

COMPLAINT
CASE NO. 4:15-cv-4625

1       C.      Directing the Company to take all necessary actions to reform and improve its

2  corporate governance and internal procedures, to comply with the Company's existing governance

3  obligations and all applicable laws and to protect the Company and its investors from a recurrence

4  of the damaging events described herein;

5       D.      Awarding to Plaintiff the costs and disbursements of the action, including

6  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

7       E.      Granting such other and further relief as the Court deems just and proper.

8  **JURY DEMAND**

9       Plaintiff demands a trial by jury on all issues so triable.

10

11  Dated:  October 6, 2015       By:     *s/ Patrice L. Bishop*

12                                   Patrice L. Bishop
                                 **STULL, STULL & BRODY**

13                                   9430 West Olympic Blvd., Suite 400
                                 Beverly Hills, CA  90212

14                                   Tel:   (310) 209-2468
                                 Fax:   (310) 209-2087

15                                   Email: service@ssbla.com

16                                   Thomas J. McKenna
                                 Gregory M. Egleston

17                                   **GAINEY McKENNA & EGLESTON**
                                 440 Park Avenue South, 5th Floor

18                                   New York, NY 10016
                                 Tel:   (212) 983-1300

19                                   Fax:   (212) 983-0383
                                 Email: jmckenna@gme-law.com

20                                                     egleston@gme-law.com

21                                 ***Counsel for Plaintiff***

22

23

24

25

26

27

28

## **VERIFICATION**

I, Victor Veloso, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Rocket Fuel Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Rocket Fuel Inc. common stock at all relevant times.

10-2-2015
Date

VICTOR VELOSO

1